Owner Operator Independent Drivers Association at all v. PA Turnpike Commission at all, Appellate No. 19-1775, Planning Council. Good morning, Your Honors, and may it please the Court. My name is Paul E. Collins, Sr., and I appear today on behalf of the Owner Operator Independent Drivers Association, a large association of small business truckers, and the National Motorist Association. Ordinary drivers like you and me will operate vehicles frequently on the Pennsylvania Turnpike. I would like to reserve three minutes for rebuttal. Counsel, we would ask if you could, and we know that you guys received this later in the afternoon, if you could help us answer some of the questions we put to you in our communication from yesterday. Let me do that. Thank you. I'm anxious to get at those questions. Let me start with the proposition of what a user fee is. A user fee is a compensation paid to a government unit for providing specific facilities to persons who agree to pay for the use of those facilities, like a toll. The highway covered by a toll is a special facility constructed in a sense that has limited access. Only the people who are willing to pay the toll are entitled to access there. And when they pay that toll, they're paying for the privilege of using that limited access highway. But the Supreme Court has repeatedly talked about a tax and toll as being the same category. Why isn't a toll simply a type of tax? It's a tax for the privilege of use of the roads. And as the Supreme Court has said in a number of cases, that tax can be imposed in a number of ways. It could be a flat fee, it could be by mileage, it could be by number of axles. And then the user fee may have certain criteria that define what subset of tax those user fees are. But not all tolls would need to be user fees. I'm not familiar with the Supreme Court authorities that you point to, Your Honor. Certainly, a user fee brings revenue into a government unit, as do taxes. But beyond that, the similarities start to fade out. I have no doubt that a good law professor, using the Socratic method, can invent situations where the line of demarcation between a tax and a user fee might be difficult or more difficult than otherwise to find. Tolls are on such an extreme end of the user fee definition that the American Trucking Association in the Rhode Island case, which you called to our attention last night, Rhode Island is the first case in 80 years under the Tax Injunction Act that someone called a toll a tax. There's another really important reason. Isn't that because it's come up? Almost all of the cases that are in this area have percolated to the Supreme Court from state Supreme Courts. They haven't gone through the federal system. And presumably, they haven't gone through the federal system because of the Tax Injunction Act issues. I usually prefer the federal courts in such matters to look for declaratory and injunctive relief. I bring my cases, where possible, to the federal court and get a more neutral form of justice. But let me give you a definition of tax, and this may help you with the user fee. A tax is a mode of raising revenue by a duly authorized taxing authority. And the revenue is raised from the general public for the needs of the public or for general public purposes. That's a tax. Isn't that what you allege in your complaint, that here they're engaged in revenue-raising for purposes far beyond simply the use of the turnpike? Those are terms that you use, that it's a revenue-raising function. Let me read you from Mastrangelo v. Buckley, a Supreme Court of Pennsylvania decision that specifically says, it gets to that point, who can impose a tax? The power of taxation in all forms and of whatever nature lies solely in the general assembly of the Commonwealth acting under the aegis of our Constitution. Mastrangelo v. Buckley, 250 Atlantic 7447452. The Pennsylvania turnpike authority is not part of the legislature. It has no authority to impose taxes. It is responsible for establishing, setting the rates for, and collecting tolls on the turnpike. It has no authority under Pennsylvania law to do anything with taxes. It has no authority to impose a tax. Ergo, the tolls it imposes are not taxes. It has no authority to do that, no capability to do that. If it were to attempt to do that, it probably violates the Commonwealth's Constitution. But it's the legislature that passed Acts 44 and 89, right? They did, yes. And that directs the Pennsylvania turnpike authority to impose higher and higher rates of tolls on the turnpike. And it also directs them to use this for purposes that are not functionally related to the turnpike. That's a direction. But the Act itself is not a toll or a tax. The Act is directing the authority to do something which we contend violates the federal Constitution. But that is the entity authorized to impose taxes, and it's giving a direction by the terms of those Acts that includes things like very broad statewide projects. The answer to that would be that the legislature has very limited powers under the Constitution to delegate authority to impose taxes. It may delegate authority to counties, municipalities, but in each case of such delegation, the entity to whom the delegation is made are run by officials who are elected by the people at the polls. And so the legislature has no authority to delegate to the Pennsylvania Toll Commission, which is not elected by the people, not elected at the ballot box. They're all appointed by the governor. So the idea that in Act 4489 you can delegate authority to impose tolls runs counter to the entire structure that governs in the Commonwealth of Pennsylvania. If the commission has the authority to increase the tolls on the turnpike, why is the increase in this case offensive to the truckers? The revenues generated today last... You don't question that they have the authority to increase tolls? They have the authority to increase tolls and to set the tolls and to collect them. But that authority is constrained under the Commerce Clause and under the constitutional right to travel. Constrained how? Under the Commerce Clause, the Dormant Commerce Clause, you may not impose user fees that put an undue burden on interstate commerce. And right now the tolls are generating... of the value... of the cost, rather, of operating and maintaining the turnpike. Vastly in excess. The case that controls is Evansville. Might that be because they had not imposed increased tolls for several years, and now they are catching up with what they should have been doing? With all respect, Your Honor, that would not be the reason. They increased tolls, I think, prior to 2007 maybe five times in the prior 50 years. Hardly at all. They've increased tolls regularly in response to Act 44. Now, the increase includes Pennsylvania drivers also. It includes anybody who's using the Pennsylvania turnpike. That's correct. We are not alleging discrimination in this case. But the Evansville case plainly says that a user fee has to be... cannot exceed an approximation of the actual cost of providing the facility or the value of the benefit provided. Is that the case on which you rely, the Evansville? That's correct, no. Not the Pike case? Not Pike, no. Why shouldn't we read those as criteria for how you define a user fee? And why isn't that considered? In other words, looking at it from the perspective of Amicus's argument here, that Evansville, in defining a subset of whether it's a revenue-generating measure or tax, and we can come back to that, but user fees are some subset of that that meets certain criteria and therefore are per se constitutional. I mean, Commonwealth Edison talks about it being... a user fee being something that has been designed and defended on that basis. And here, when we're talking about the increase in tolls, the Commonwealth is not arguing that these increases were either designed nor are they putting forward as a defense that it is commensurate with nearly the budget for running the Turnpike. They're candidly saying, these are all of the statewide projects that we are now raising revenue for, and that's the nature of your complaint at all. That's what they're saying. That's correct, Your Honor. So how is this designed or defended as a user fee? Because under U.S. Supreme Court authority, Evansville, Northwest Airlines, it is a user fee, as I defined, a fee paid by a person who elects to use a special facility constructed for his potential benefit by the state. And the Evansville case says that you may not impose user fees that don't represent at least a rough approximation of the cost of the facility that you're making available. But isn't it true that in Wallach, we relied on a case called Auto Club, and in that case, they were looking at the transportation system in a broader way. And if that's the prism that our precedent says we should follow, how can you get around it? Isn't it the precedent that tells us it's not just for the fee to use the specific Turnpike, but the system in which the Turnpike operates because all benefit from better means of getting around the Commonwealth of Pennsylvania? That's part of my question. That's an interesting policy that you might want to settle someplace else. Well, I'm not talking about policy. Excuse me, counsel. I know that we are not policy makers. I completely get our job. And I'm talking about our precedent, and our precedent relied on that view, that you look at the benefit provided to the transportation system. How do we not follow Wallach's message? For several reasons. In the Auto Club cases, they were dealing with transportation to and from the island of Manhattan in New York. Tunnels, bridges, rapid transit. And there was a single integrated transportation system that they demonstrated through expert testimony at the trials. And if the Lincoln Tunnel goes down, it's going to affect the Holland Tunnel. It's going to affect the George Washington Bridge. That small island of Manhattan is a single integrated system, and that was established there. That is not the case with the Pennsylvania Turnpike. I understand your argument. I get where you're going. Let me just ask you one other question before we see if my colleagues have anything further before we hear from your adversaries. In your complaint, I think it's at paragraph 84, you list a series of projects that plaintiffs contend were supported by tolls that were collected from the Turnpike. I'm going to call them non-Turnpike projects funded by tolls. Your adversaries respond by saying there's congressional enactment that authorizes all but two. And with respect to the two that aren't authorized, they say that there's no allegation that toll funds were used for those additional projects. One was the airport terminal, and another one dealt with a train. Are you able to say that they're wrong and that the statutes that they bring our attention to do not authorize the expenditure of the funds? And if so, why are they wrong? The statute that they make reference to, 23 U.S. Code 129.83, authorizes the secretary to continue to make funds available if the states agree to conform their conduct to certain standards. And if they conform their conduct, it is not an authorization for the states to do anything. It's an authorization to the secretary to make funds available notwithstanding 23 U.S. Code 301, which says you can't make it available if you're dealing with a toll. But to be more specific, if you look at the statute that they quote, it allows tolls left over to be expended on non-tolled facility items. But it does not authorize the state of the tolling facility to double, triple the rate of the toll in order to generate excess revenue to fund those other things. If I could ask you, counsel, for the benefit of the record, I know you're holding a document up, and you said that statute they're relying on. Can you just tell me the citation you were? 23 U.S. Code 129A. And that has nothing in it authorizing the state to raise toll revenues. It doesn't authorize them to raise toll revenues in an unconstitutionally inappropriate way. But what it does do is say the decision to use those monies and have a mechanism for getting them is not going to be a violation of the Commerce Clause. And the precedent tells us quite clearly that if Congress has blessed the conduct, it can't violate the Commerce Clause. Look at Norfolk Southern v. Oberle, 822 Fed 2nd 388-393. It contains an excellent summary of the Supreme Court decisions which put real standards on when you can find that Congress authorized someone to violate the Commerce Clause. Congress must affirmatively contemplate that situation. That statute was enacted in 1991. 4411 was 2007, I believe. They could not possibly have contemplated that. It must be unmistakably clear, specifically authorized. Counsel, let's look at the actual language of the statute because 129A doesn't say it's authorizing the Secretary. It talks about authorizing the public authority. The public authority that may use the excess toll funds. And it doesn't use of the excess toll funds presuppose that they have been able to generate excess toll funds. The standard has, they must affirmatively contemplate this. Congress, it must be specifically authorized. Unmistakably clear. There is nothing in that 123, 23-129, that authorizes states to raise taxes, tolls rather, in a constitutionally inappropriate way. Why doesn't the whole history of this statute, the very purpose for which the statute was enforced, speak to that? That is that previously, if I understand it correctly, it had been the case that had a state raised excess revenue, it would be forfeiting federal funds. As a condition of receiving federal funds, it had to stay within that limited budget. This act was what authorized a change in that. In other words, states could now, presupposing they could raise them, which they previously couldn't, now they can use them. The way this statute was framed is giving the secretary additional authority to make federal funds available if states conform their conduct to certain standards. It authorizes expanded flexibility by the Secretary of Transportation. It does not direct its attention to the authority of the state to do anything. They must conform their conduct to standards. But when you look at the... But that's the public authority, not the secretary. The public authorities who want to get federal funds must conform their activities to certain standards. We can't use excess toll revenue for any purpose. Yes, but there's nothing in that statute, Your Honor, that contemplates that the public authority is going to double and triple the toll rates in order to generate that excess revenue. Because that is... The rate at which they have increased the tolls is constitutionally inappropriate. And there is nothing in that statute that authorizes the authority running the toll facility to do something in a constitutionally inappropriate way. Isn't that what they couldn't do previously without forfeiting federal funding? No, no. The restrictions that were lifted on federal... that they could now do more things without forfeiting federal funding is the last part of that statute. They can use excess tolls. But the front part of the statute does not authorize them to intentionally generate excess tolls for the specific purpose of funding projects outside of the toll facility. Well, I think Congress was happy to have the state find a new means to get those dollars because it talks about substituting basically funds that the feds would have obligated for these projects. Now the state, with its excess toll money, can be used. So maybe that's exactly what they were hoping to accomplish. The expense of running a big turnpike can vary from year to year, and there are always excess funds. Some years with a lot of snow removal, police work, floods and all that. Other years without that. They accumulate under the Evansburg standard when the tolls are just a rough approximation of their actual cost. They can accumulate revenue. And that last section allows them to take that revenue, which is accumulated in the normal course of things, the nickels and dimes that I've spent every year, and to use that. There is nothing in this provision. And again, look at Norfolk Southern and Tri-M Group. They're cited now briefly. It must be specifically authorized. Congress must contemplate that they're going to do this. Didn't the Second Circuit conclude that it had? I mean, that's New York State's ruling, right? No. What they looked at is whether or not the toll facility was looked at as everything that helped them get people on and off the island of Manhattan, and they were all related. That's not the case here. I'm talking about the New York State Freeway I.T.S.E.A. case. The A.T.A. case? No. The New York, it was another American trucking case where the Second Circuit concluded that the statute there did represent an authorization by Congress to... They did. And what they were looking at... They were looking at I.T.S.E.A., Section 1012E, which was a special provision put in by Senator Moynihan that authorized revenues from the New York Freeway to be used to support the New York canal system. It's a big tourist attraction and a favorite of Senator Moynihan. That was a rifle shot at that gift to the canal system and nothing more. But that's an authorization to use just like the authorization to use here. No, no. It may be for different purposes than what's listed out that federal funds can be used for, but in terms of the language, wouldn't we be splitting from the Second Circuit to say that I.T.S.E.A. didn't cover this, wasn't an affirmative authorization? The problem with it is that it was an authorization specifically to fund the canal system. And that was in Subsection E of 1012A. It never got codified. People just forgot about it. And in the first iteration of the New York toll case, they found that the excess tolls being spent on the canal system violated the Dormant Commerce Clause. Then, wow, everyone discovered this very special provision which satisfied the standards cataloged in Norfolk Southern that I showed you. Judge, my case had a question. Yes, Mr. Cohen. In order to agree with you, we would need to determine that the toll increase in this case is excessive and contrary to the Commerce Clause. That's correct. If we have to do that, does that mean that we have to determine what is fair and reasonable, what is not excessive? I mean, how do we go about that? I think for the purposes of this case, you can say as a matter of law that tolls which accumulate 300% of revenue, representing 300% of the actual cost of running the turnpike, are excessive. Some other court in some other case might have to draw a line someplace. This case, no court has ever found 300% to be reasonable. Well, that's what I worry about. Is that a task that should be left to the judiciary or the legislature? It is a task that has been given to you by reason of your responsibility to enforce the Dormant Commerce Clause. Are we really able, are we even in a position to say whether additional dredging provides a sufficient benefit to fare users as opposed to a first-level dredging? Is that really where the Supreme Court, given some of the language that appears, for example, in United Haulers, is telling us we should go with the management of local authorities? Under the Evansburg Standard, you are required to look at whether or not the tolls imposed bear a reasonable relationship to the cost of maintaining and operating the facility. Who bears the burden of proving that? Pardon me? Who bears the burden of proving that? I would say the people who are asserting that if you're using the turnpike and you're filling potholes 300 miles from there, that has no benefit to the people who are driving the turnpike. My question is who bears the burden of proof to show that that's excessive, unreasonable, et cetera? Isn't it the plaintiff? We'd accept that burden in this case. This is not a closed case. I mean, this is miles from being a closed case. So this really turns on, then, you're viewing user fees as some sui generis category subject to its own freestanding Commerce Clause test. Because if it were to be viewed as a tax, would you agree that under complete auto, given where the Supreme Court took the fourth prong in Commonwealth Edison, that the fair approximation argument you're making would no longer hold? I think the fair approximation standard is somewhat weaker from our point of view in the iterations of the Montana case and the Oklahoma case that you mentioned in your letter to us last night. But it's not an impossible burden. But it's more difficult for us, I will grant you that. Well, they did away with any equivalence whatsoever. Then we're just looking to the benefits of living in a civilized society provided by general taxes. That's why this is not a tax, Your Honor. Well, I understand you would not want it to be a tax for the result it imposes. But why isn't it, in fact, a tax when its purpose is being held out as a revenue-generating measure? And the Supreme Court, in all sorts of cases that we included in our letter to you, and again, we recognize it's short notice and the parties may seek supplemental briefing on that. But why, with cases where the Supreme Court itself has talked about tolls as being a species of tax, a tax on the privilege of using the road, it talks about use but also the privilege of use. And then the concept of a user fee as something that is per se constitutional would make a lot of sense and be consistent. But why would it make any sense to treat differently, for example, a fuel tax based on miles versus a toll that is based on miles? Well, a fuel tax that is excessive in relation to the taxable event could be challenged under the Commerce Clause. I've filed cases like that in years. I think this question is why would that be subject to complete auto and not Evansville? It's a given that the fuel tax is subject to complete auto, right? That's a tax. No, I don't concede that today, that that particular tax. It's a fuel use tax. It's a tax on the consumption of fuel per mile driven, and it is designed to recover wear and tear on the highways imposed by people who drive over them. But it's been subject to complete auto. It's been treated as a tax, right? You can make a case. That's somebody else's case. The case we're dealing with today, Rana, is whether when the Commonwealth of Pennsylvania creates a facility, which it did many years ago, called the Pennsylvania Turnpike, and it expends money in creating and maintaining that, and it offers access to that to people who are willing to pay for it. That is a user fee, and it's governed by the constitutional provisions directed at user fees, Evansville Northwest Airlines. And the Supreme Court tells us that you may not impose charges that bear no relationship to the cost of operating and maintaining or that bear no relationship to the actual value given to the person who's using the turnpike. Well, it hasn't told us that you may not. It has always said it the other way. That is, if you meet those criteria, it is constitutional. The Supreme Court has not said, if you don't meet those criteria, it's unconstitutional. To the contrary, it has proceeded to look under complete auto at other ways it could be constitutional. Right. I disagree with that analysis. If you don't meet those standards, you look at the extent to which they exceed the standards, and does that create an undue burden on interstate commerce in violation of the Dorman Commerce Clause? And there are dozens of cases that give this court and others the authority to look at the burdens created. But Shiner itself said, notwithstanding our recent precedent in validating taxes where they're internally inconsistent, that it would be constitutional if the tax nonetheless passes muster under Evansville. I mean, isn't that to say you look at this typically as a tax? But if it can meet the Evansville criteria, then it's something that's going to be, almost in the nature of an affirmative defense, constitutional. The court in Shiner specifically exempted user fees from its analysis. And it's stated right there. I could give you the jump site. I'll make sure someone gets it. As did the case in the Montana Consolidated Edison case. Specifically said, we're examining general revenue fees or flat taxes, in Shiner's case, or coal or extraction taxes in Montana. Do not apply what we say here to user fees. They are entirely different. In many ways, counsel, but my concern is that that's essentially circular. It's a user fee that meets these criteria. As it meets these criteria, it's constitutional. So if something is held out as a user fee, you analyze to see if it actually meets the criteria for a user fee. If it doesn't meet the criteria for a user fee, that doesn't mean it's necessarily unconstitutional. You're still looking at the broader question of whether it imposes an undue burden on interstate commerce. The conclusion of the court in Evansville is if you fail the three-part test there, two of which are relevant here, if you fail any one of them, you've created an undue burden on commerce, which is actionable. They set that standard, and they said if you impose a user fee that exceeds significantly the cost of operating or maintaining the used facility, or if the amount of the charge exceeds the value of that use to the driver, in this case, it is an undue burden on commerce. Evansville's language is at least so long as the toll was based on a fair approximation. And they concluded it was, so of course they didn't need to go forward with further analysis. But it's at least so long as. Not that that was for tolls, tolls being identified as some unique category of tax. And where do we get the authority that tolls, if the toll is based not on compensation for the specific services that are being offered, but the toll is very candidly being based on general revenue-raising purposes, why would that still have to meet the criteria for user fee? What authority says that? You have to convert it into a tax and hold that it's a tax to get it over under complete auto transit. It is promulgated by an agency, Pennsylvania Toll Commission, which has no authority to impose taxes. Absolutely no authority under Pennsylvania law to impose a tax. So this sleight of hand trying to convert what clearly meets the definition of a user fee, convert it into a tax, the blocking point there is the agency that does that has no taxing authority. So if for some reason a court were to hold that this is a tax, it would void the entire toll structure in Act 44 and 89, the toll structure part, not the whole statute, just that piece, because it was enacted by someone without authority? Is that the consequence of that holding? I've not pursued those implications, but it certainly would be looked at by a lot of people in the back of this room, I'm guessing. So we haven't seen that. But when you see in the New York Thruway case, before it was found that Congress consented to helping out the canal system, before that happened, the tolls were 7 or 12 percent of the revenue going into the thruway. And they found that to be constitutionally excessive. Here we're at 300 percent. You don't have a difficult question here. It is so far over the top that I don't think the Third Circuit Court of Appeals wants to be the first one to say we're going to let you off the hook. We don't care whether they're 300 percent. We don't care whether it's $500 million a year. We're allowing the state to take all this money that should be paid by the local residents here and pass the cost of all of these local goodies that you get scattered around the whole state and pass that off to the interstate trucking industry. I don't think you want to make that decision. It is so far off the center post of reasonableness that it is not a close question. Now, if you get down to 6 or 8 percent or 2 or 4 percent, you get an interesting question. Here we're at 300 percent. You don't have an interesting question. You've applied the Evansburg test, and you've looked at how much they're raking in with these fees, and they are so far out of line with anything that could be reasonable. I think I'm repeating myself. The remedy that you seek is for us to determine that the increase here is way out of line and violated because it's an effect on interstate commerce. Is that correct? That's correct. What happens to the case after that? It goes back to the Turpike Commission, and they make another ruling, and they lower it a little bit. What happens after that? We have had a pending motion for partial summary judgment on the liability. They are liable. It would have to be remanded to the district court for remedy. We would look for prospective contributions. Yeah, that's what I'm trying to get at. What is the remedy that you're seeking here? Well, there are all kinds of situations that people wring their hands over. Let me assure you that the interstate trucking industry does not want to run the Pennsylvania Turnpike out of business. It's a very important facility that operates to the benefit of regular people and especially truckers. Going over the mountains here with heavy loads, you need a good, well-run highway. We don't want to run them out of business. But the governor here and the auditor general have all said this Act 44 is not sustainable in the long run. You can't impose these vastly excessive tolls and expect people to still run the Turnpike. That's Fuentes' question that was about remedy. We will accelerate the process of finding a solution to this. In order to get to that point, then, the release, you want a declaratory judgment, presumably that it violates the Dormant Commerce Clause, at a minimum, from your point of view. Return it back to the district court. Return there. I see. We'll sit at the table and work something out. You talk about taxes, Judge Krause. I think taxation is the solution to this. I think the Pennsylvania legislature ought to... Do you live in Pennsylvania? I do not. There you go. Go ahead. But I do know that if you want all these benefits that the $500 million in excess tolls are producing, the citizens of Pennsylvania ought to shape up and look to doing it themselves, and not try and pass the bill off to interstate trucking and anyone who has to drive up the Turnpike. It is unfair. It is an undue burden on commerce. It violates the constitutional right to travel. But it's not enough that there's an undue burden on commerce, right? We need an undue burden on interstate commerce. And where in your complaint do you allege that there is any particular burden on interstate commerce, as opposed to commerce generally? Why isn't this like the American Trucking versus the Missouri Public Services Corporation? It's just a neutral intrastate fee. Everyone who travels the Turnpike and drives on these roads is engaged in interstate commerce. They're buying and selling lunch, dinner. They're staying at hotels. They're moving along. They're buying fuel. The whole operation of the Turnpike is described as a vital link between the East Coast and the Midwest and on to the mountain states. It is a vital interstate link, and you get on that, you are engaged in interstate commerce by driving it. You are engaged in interstate commerce by operating it and making it. And the problem is a burden on interstate commerce, not the burden on interstate travel per se. You don't have to cross a state border in order to violate interstate commerce. This is not a fee that's being imposed for crossing the state line. This is imposed on everyone who is driving on the thruway within Pennsylvania. It is intrastate. Where is the burden that is anything but neutral in terms of affecting those who are residents, those who are from out of state? Where does it affect interstate commerce? All right. Recall that the Evansville test has three prongs, only one of which is discrimination. We have not alleged discrimination. You don't have to allege discrimination. Everyone who is using that user fee, who is traveling up and down the highway, is engaged in one way or another in interstate commerce. The people who are providing the road, who are paving the road, who are policing the road, who are moving goods through commerce across that road, they're all engaged in interstate commerce. All of that's true on the local roads, too, with restaurants and people living their lives within a state. That doesn't make for interstate commerce. A burden on interstate commerce from the particular fee being levied needs to be affecting in some way. We've got to look to the purposes and effects. The court has told us to take a more nuanced approach to purposes and effects. And so where is the effect on interstate commerce here? A truck coming across the Delaware line into New Jersey and then up the turnpike, he fuels up. Where does he fuel up? Perhaps in Pennsylvania, perhaps in Delaware. But he fuels up and he's burning fuel that he purchased in the flow of interstate commerce. When he runs out, he buys more fuel in Pennsylvania and moves it on and uses that fuel in Ohio or Indiana. That's all interstate commerce. When he's moving goods across, he'll bring some into Pennsylvania and drop them off. But all they're doing is driving goods across, the movement of a car, a truck, across state lines. But that doesn't mean interstate commerce has been burdened in some way by the toll. That's right. Everybody in the state has to pay. The concept of burdening interstate commerce, or commerce generally, is much broader than the old Crandall case where there was a car getting lost. No dispute about that. Pardon me? No dispute about that. Okay. But Judge Cross's point, I think, is that interstate commerce hasn't been impacted by the presence of the toll. Your complaint, in essence, is saying out-of-staters are having funds used for non-turnpike purposes and we out-of-staters don't get a benefit of that. Therefore, there's a burden on interstate commerce. Is that your theory? I would have a tough time convincing a driver who fuels up and goes the length of the turnpike, pays $1,800, $1,900 to go the length of the turnpike, that his business, and he's certainly engaged in interstate commerce, that his business is not impacted by that $1,900 fee. What was it before the increase? Oh, 10 years ago it might have been $700 or $800. That's for the heaviest truck. Right. But that's before the increase. That's before the increase. So it went from $700 to about $1,900? Yes. I assume that cost is passed on to the ultimate consumers? Well, don't be so quick on that. I need a very good economist to see how quickly an owner-operator-driver can pay that and pass it through to the shippers and receivers that he works for and get that. Long-term, it likely would. In the long run, it would. In the short run, not necessarily. That's an interesting economic exercise that I've been through before. And long-term, it probably is passed through short-term. All right. Well, we'll hear from your adversary. Why don't you have a seat? You've been up here for a bit. Thank you very much. And we'll have you back on rebuttal. Good morning, Your Honors. May it please the Court. I'm Robert Byer, and I represent the Pennsylvania Turnpike Commission Appellees. And we're dividing time this morning with my friend, Mr. Merenstein, who represents the Governor and the Secretary of Transportation. I'll be talking about the Dormant Commerce Clause issues, and Mr. Merenstein will be talking about congressional authorization. I guess that means that the communique from the Court, I think, you're going to answer. I will speak about the communique from the Court, too. Very good. Why don't we start with that, if you don't mind? I would be happy to start there. It really matters not whether we call this a tax or a user fee for purposes of Dormant Commerce Clause analysis, with the possible exception of getting into the issue of the Tax Injunction Act. The issue is one of federal law, and I think it would be fair to analogize, for Commerce Clause purposes, the turnpike toll and the manner in which the Pennsylvania General Assembly and the Turnpike Commission has imposed it and directed that it be used. You could analogize this to a tax. Certainly, in the Evansville case, the opinion of the Court uses interchangeably the term per capita tax with the term user fee. There's no real magic to calling it one or the other for purposes of the Commerce Clause analysis. Even if we look at the elements of the test, and recognizing that the Supreme Court has been moving in a direction in which it has been telling us, let's get away from formalism. Let's get away from trying to put labels on things. Let's apply the Dormant Commerce Clause in a manner consistent with what it was really intended to do. If we look at the Evansville-Vanderburg Airport Authority test and compare that to the complete auto test, the only things that are really different in complete auto is the requirement of a nexus and the requirement of apportionment, which comes up in a question of interstate taxation for obvious reasons. Otherwise, the question of whether, for purposes of Evansville, whether the fee is excessive in relation to the benefits conferred is very similar to the requirement in complete auto, as explained in subsequent cases, including Commonwealth Edison, that the tax is fairly related to the benefit provided by the state. Except that Commonwealth Edison removed the equivalence requirement in a very clear and explicit way. It's not clear, given the language of Evansville, that that fair approximation has the same now-evolved meaning to encompass benefits as broad as statewide projects. But there's absolutely no reason why that shouldn't be the case, in the sense that the appellants have not come forward with any policy-based reason based upon Dormant Commerce Clause policies as recognized by the United States Supreme Court with respect to why the Evansville test should be viewed in such a rigid fashion as to restrict the benefit analysis in that case to the item for which the fee is imposed. So you think we should be taking a system-wide approach like Wallach? I think Wallach requires, as a matter of this Court's precedent, that you take a system-wide approach. Wallach relied upon Hughes very directly and very explicitly. Hughes relied on pike balancing. But do we have to even use pike balancing? From your point of view, we can evaluate excessiveness based upon the benefit to a broader system? You could. Pike balancing, though, is the test that the Supreme Court has told us to use if we're not dealing with a tax, although in the Wayfair case, which is the Court's latest formulation in a more general way, there was the Thomas case two weeks ago. How can you say that, though, when in Oregon Waste it says the Evansville legal standard applies to user fees? Again, the Evansville standard has never been used to strike down a fee by the U.S. Supreme Court. Whether it's been successful or not doesn't mean it's not the test. It just might mean that those facts didn't merit relief. Well, it's a test for validity. It's not a test for invalidity. It doesn't set a ceiling. It doesn't set a limitation. No court has ever, with the exception of the vacated decision in the New York Freeway case, the vacated district court decision, no court has ever struck down a mileage-based toll. And here we get into some reasons that relate to the question of is there an effect on interstate commerce versus an effect on commerce generally. You don't think there's a point at which you really are charging excessive tolls? At some point, whether you triple, quadruple, quintuple, at some point can a court say this is just too much and a burden on interstate commerce? I think in a theoretical case, if you could show that interstate commerce itself was being burdened in a way that did not apply equally to intrastate travel, intrastate commerce perhaps, but that's not this case, Your Honor. Do we have to go there or can we just say it seriously affects interstate travel? Well, let's look at the complaint in this case. And the question was what is there in the record? And, of course, this was decided on a motion to dismiss. The only thing in the complaint is in paragraph 43 in which the plaintiffs allege that most of the traffic on the turnpike consists of cars, but trucks pay over 50% of the tolls. But there's no showing with respect to how much of this is involved in interstate travel versus travel from point to point within Pennsylvania. And why is that significant? Well, in the Schneider case, the court upheld the fuel consumption tax or pointed to that as a tax that would be upheld because it was based on an apportionment based on mileage traveled within the state. That's similar to the analysis that was used in the American Trucking Associations versus Michigan Public Service Commission case that was not cited in the brief, but it was a 2005 U.S. Supreme Court decision at 545 U.S. 429 where the fee in that case was applied even-handedly to all transportation. This court's decision in the Norfolk Southern case, which my friend cited twice, Judge Stapleton's opinion for the court in that case says very directly, unless you can show that there's some differential in treatment between people who are traveling from one state to another versus people who are just traveling within a state, you have an effect on commerce but not an effect on interstate cars. That didn't seem to be the standard that was applied in Evansville, was it? Evansville didn't talk about that because Evansville was a different situation and involved a $1 per capita tax or $1 per passenger user fee. It did not differentiate between interstate and out-of-state travel. It didn't need to because the court upheld the levy as against any dormant commerce clause challenge. The court simply has not dealt with that situation nor has there been any necessity of doing so. Now the question of whether this court calls this a tax or let's just say it's like a tax under the complete auto test or is it a user fee, what the court does as a matter of federal law, both for purposes of the commerce clause and for purposes of the Tax Injunction Act, would not have a bearing on what this fee is or what this toll is under state law. So if this court were to say it's a tax, there's not going to be some response saying, oh my goodness, it's a tax and it was imposed by an entity that doesn't have taxing authority. If this court were to explain that it was doing so as a matter of federal law, for example under the Tax Injunction Act, the Robinson case says that that is determined not by state law but as a matter of federal law. Let's assume that was a case that somehow an opinion was written that said, we view this as a tax for the purposes of federal law because it's like a revenue raiser. That should have no collateral consequences, although I wouldn't... What happens to the Tax Injunction Act then? If we call it a tax, don't we lose jurisdiction? It can be a tax for commerce clause purposes or at least analogized to a tax without necessarily being a tax for Tax Injunction Act purposes under the tests that the courts have applied for that purpose. That's an issue that I can discuss briefly this morning, but frankly I think would benefit from supplemental briefing. Well, I'd like to hear what you have to say. Well, in terms of the test that's used, there's the Bedart Brothers test from the Ninth Circuit. There's the San Juan Cellular test from the First Circuit. With respect to what's a tax? Yes. Depends on who imposed it, whether it's a general revenue raiser, etc. Correct. So for who imposed it, this was imposed by a commission, a state agency, not by the legislative branch of government. And Acts 44 and 89 do not impose the turnpike tolls. That's simply a direction from the General Assembly to the Turnpike Commission of how much money the General Assembly wants the Turnpike Commission to contribute for state transportation purposes. And that is what necessitated the rate increases here, the toll increases. So the question of who imposed it, that would lean in favor of this not being a tax. But the question of how it is being used, yes, this is being used for more general purposes, not general revenue, not general purposes of the state, but transportation purposes, purposes that are, in effect, related to the turnpike because by making other roads in better condition in Pennsylvania, and there are other statewide roads and many means of getting across Pennsylvania. It eliminates some of the burden on the turnpike, eliminates congestion, makes the turnpike a better road for people who want to go across the state. In addition, by supporting mass transit. Is the increase restricted solely to travel purposes? The increases, the money that's being used under Acts 44 and 89 are all related to transportation purposes of one sort or another. And the interstate commerce, which is why we have a tough time understanding how a federal court could say that a use of money for purposes that would benefit interstate commerce nevertheless could burden interstate commerce because the state is using it for that purpose. To me, there's an inherent contradiction. So would your position be that the Evansville or complete auto, doesn't matter which one we apply, the Acts 44 or 89 would survive a dormant commerce clause challenge? That's correct. The Acts would and the tolls would because you would use pipe balancing. There is no differential in treatment. But you say pipe balancing. I said to you Evansville or complete auto. If you use either one of those tests, I believe that the toll still is sustained because there is a benefit there and there's no showing by the plaintiff of any effect on any burden on interstate commerce as distinct from commerce in general. They have conceded that there's no discrimination. They don't allege discrimination. And they haven't shown how this has a peculiar effect on interstate commerce. And that's their burden. From your point of view, we wouldn't even have to talk about any of these tests because if we go to Wayfair and the Supreme Court's pronouncement of these are the two general principles that sort of inform all dormant commerce clause law. One of them is burden on interstate commerce. So from your point of view, we don't even need to fuss about toll, not a toll. As a matter of pleading, there's a failure here because there's been no allegation of a burden on interstate commerce. And that's what Judge Kain found. Judge Kain determined in the trial court that there was no showing of anything beyond an effect on commerce in general and not an effect on interstate commerce. What about you had pointed in Shiner? I mean, it's true that when it came to the fuel tax that was apportioned, the court upheld it. But when it came to the flat tax, one of the things that the court did in Shiner was it seemed to resurrect the idea from Judge Frankfurter's dissent in Greyhound that if you have a privilege that is less likely to be used by those who are traveling through the state, that that privilege is less valuable and you're charging the same amount. Why wouldn't that carry over to looking at the tolls here being charged to those who are from out of state and less likely, say, to use a pedestrian path or a bicycle path in a local neighborhood? Well, because Shiner also said at page 433 of the official report of that opinion that if the revenue measure involved maintains state boundaries as a neutral factor in economic decision-making, and that's a quote, there is no problem for purposes of the commerce clause. And again, it was dealing with the discussion there of the fuel consumption tax, but it was contrasting it with the flat taxes. The flat taxes in those cases definitely involved a differential in treatment of interstate versus intrastate commerce because it was a protectionist measure. People who had their trucks registered in Pennsylvania got a discount versus the imposition of the axle tax and the other tax, which the court's opinion takes great pains to show, resulted in the imposition of a greater fee that, in effect, was declaring war on vehicles from other states. And that's the type of thing that the commerce clause and the dormant commerce clause were intended to prevent. But none of that is implicit in this case. None of that is implicated by this case. Do the benefits at least need to be accessible? Or asked in another way, what then, if there is one, the limiting principle, could you be charging as part of what goes into the rates or amounts of tolls, even collecting from those traveling simply through the state, funding for the school system or underwriting utilities? Well, one limiting principle is a question of state law. Would state law permit that to be done in such a way? I'm not sure that would be the case in Pennsylvania. But another limiting principle would be, of course, Congress. Sometimes remedies in the commerce clause area have to be under Article I and not under Article III. And I think that if things were getting carried away, Congress could speak. But, in fact, Congress has spoken here. I don't want to intrude on Mr. Merenstein's point. But Congress itself has allowed these tolls to be used for purposes that go beyond the road. Well, that's Congress speaking to its plenary authority under Article I, Section 8 of the Constitution. How we get into this implicit doctrine involving a negative effect of the commerce clause under those circumstances is hard to fathom. But beyond that, that is a limiting principle. Another limiting principle might be, again, if somebody could show that there, in fact, is some undue burden being imposed on interstate commerce, that there's a differential in treatment. But none of that is here. Could you speak briefly to the significance of American Trucking Association versus Michigan Public Services Corp.? Compared with the $100 fee, the court was treating it not as a tax but with tight balancing, with the sort of levy that, in prior cases, it had analyzed somewhat differently. What does that signal about where this court, many of those members still being honest, is taking us? Well, I think it signals that the court has moved in a continuum that is viewing these undue burden cases with greater circumspection, particularly where there's no discriminatory effect being shown, let alone any actual discrimination. And in the American Trucking Association case that Your Honor cited, again, the court said expressly, quote, the statute applies even-handedly to all carriers that make domestic journeys. It does not reflect an effort to tax activity that takes place in whole or in part outside the state. Nothing in our case law suggests that such a neutral, locally focused fee or tax is inconsistent with the Dormant Commerce Clause. That is this case. If we take that view, aren't we, in essence, abrogating Evansville? What is left for any distinct treatment of a user fee? Well, the court itself, again, in the Michigan case, was using fee and tax interchangeably. But what is left of Evansville is what probably was always there in Evansville. It was a test of validity. It was not a limitation on a state's power to exercise its full sovereign functions on matters that were of traditional state concern, like the maintenance of highways and toll roads. I don't understand if you could explain to me, when you say it's a test of validity, what does that mean? Valid as it relates to what? Dormant Commerce Clause or something different? It's a shorthand way of saying that if you meet these criteria, you're valid. Valid as to what? Valid as to if it does not violate the Dormant Commerce Clause? It doesn't violate the Dormant Commerce Clause. And if there's nothing in that opinion that says, or in any of the subsequent cases, with the exception of perhaps some authority in the Second Circuit, the Bridgeport case that is, frankly, inconsistent with this court's authority, this court's precedent in Wallach, that says that the Evansville criteria would be applied in the manner that the plaintiff has argued as a limitation. It is a, how can I put it, it's a threshold, it's a safety net. If you meet these criteria, there's no point in analyzing further. But there's nothing that says that you have to satisfy all four of these criteria to have a valid state act. Do you think that you satisfy the Evansville criteria? I believe we do satisfy the Evansville criteria because the benefit prong of that test, which is the only thing that's been argued here, the benefit prong of that test has to be read with reference to the benefits that the state provides as a whole. Wayfair, Part 3 of the Wayfair opinion was very eloquent on this, as was the opinion in Commonwealth Edison, that, you know, the benefits have to be decided in a broad fashion, and Wallach is reflective of that as well. Although if we adopted your approach as to what Evansville stands for, it wouldn't be the case that their approximation expanded in the same way as it has in the context of Commonwealth Edison because it would, if the argument is that meeting these criteria so that it's sort of capped at the budget for a particular facility makes it per se constitutional, that would be a narrower reading, but you'd be limiting it to the use of a sort of affirmative defense. Well, you'd still need to show some basis for saying that the funds have to be so limited in their purpose and why that's a valid purpose under the Dormant Commerce Clause to so restrict the state in the use of its funds. What is it about the Dormant Commerce Clause that would prohibit a state from using turnpike tools as a means of general revenue if they're applied across the board in a non-discriminatory fashion? I think that the appellant is reading too much into the Evansville case when it argues that. In effect, and they cited Mestrangelo v. Buckley, which is a Pennsylvania case that distinguishes between license fees and revenue for purposes of local taxation. I mean, here we're talking about what is it the Pennsylvania General Assembly has authorized. Now, what the Turnpike Commission has done is authorized by the General Assembly. But let's look at Mestrangelo. What, in effect, the appellants are doing in their use of the Evansville criteria is to take Pennsylvania's definition of a license fee and convert it into one of constitutional magnitude. And I think, again, that is just heading right into the contrary winds from the Supreme Court in terms of how the Dormant Commerce Clause is to be applied. We talked with your colleague about consequences, and I'm curious what your view is. Say we were to conclude that Evansville is a requirement for anything designated a toll, that constitutes its own category of user fees subject to its own Commerce Clause test, and that, therefore, these acts, at least the tolls that flow from them, are invalid under the Dormant Commerce Clause. What is the consequence of that to the Commonwealth? Well, the consequence would be prospective only. It would mean that that money could no longer continue to be used. But I think that even if this Court were to hold that Evansville has as narrow and, frankly, artificial a reading as the plaintiffs want to give it in this case, you still have to get around the question of where is the differential in treatment between interstate and intrastate commerce in order to get to that part of the analysis. The Commerce Clause, the Dormant Commerce Clause, isn't even implicated by a mileage-based tax that is applied to everybody based on their travel solely within the Commonwealth of Pennsylvania. If their view were the following, everybody pays the same amount, and from their point of view, pay too much, but the only ones who benefit from how those funds are used are people in Pennsylvania, and doesn't benefit those who only are passing through, is that enough to violate the Dormant Commerce Clause? It would be hard to say that the only ones who benefit are people in Pennsylvania, given the money that the state provides. I think you have to look at, again, the benefits from the state in general. They provide a system-wide look at how even those projects that may be hundreds of miles away benefit, less congestion, better roads, perhaps, because not so many people are using them, that sort of thing. The maintenance of a police force, the enforcement of laws of various sorts, the provision of other resources, and money that the Commonwealth of Pennsylvania doesn't have to use from other sources because it's using it from the money generated from the turnpike. How are the out-of-staters benefited the same way as the in-staters? Well, they're benefited in different ways, but there is a lot of overlap in terms of the general benefits, and the Supreme Court has said repeatedly that these are issues that have to be considered, including, again, Part 3 of the Wayfair decision, the decision in the analysis in Commonwealth Edison. You can't take such a narrow view of benefit as to, in fact, constitutionalize under a dormant commerce clause Pennsylvania's view of what constitutes a license. So you seem to suggest that tolls collected from trucks that come into Pennsylvania from out of state may be used for local projects, not solely restricted to transportation? Well, we're talking about two different things. What are they being used for at this time and what's being challenged is used for transportation projects. The issue of can they use it for other purposes is not really before the court, but I guess the question would be what if it were before the court? Would there be any problem there? And I think you have to look at the circumstances. You have to look at how it's being applied. And, again, is there any difference in treatment of interstate versus intrastate commerce? That might be a different case. It might require different allegations from the allegations that are made in this complaint. But I think that that's not an issue that needs concern in the court at this time. I thought before you were saying that the revenue from the turnpike is used to improve roads. Now, I understand law enforcement, which is necessary for the turnpike. But they are being used for other road improvement projects that eliminate congestion on the turnpike and provide alternative means of traversing the state. And that would include for people involved in interstate commerce as well as in intrastate commerce, who would all benefit from that. All right. Great. Thank you so much for your argument. Thank you. Thank you to your co-counsel. Thank you for your patience as we got to you. Good morning. May it please the court, first Mayor Instein, on behalf of the apologies, the Pennsylvania Governor Tom Wolf and Pennsylvania Secretary of Transportation Leslie Richards. And as my co-counsel noted, I will be addressing, to the extent the court has questions, the congressional authorization issue that you've already discussed somewhat with Mr. Cullen and if there are any questions of the right to travel issue. Starting with the congressional authorization, the one thing I will agree with Mr. Cullen on is that I would urge the court to look at its precedent in Oberly and Tri-M Group because I think those cases do make clear how different the statutes in those cases are from the statute here. And I know the court is very familiar with the statute because in the question of Mr. Cullen, you were quoting that statute. In those other cases that he invoked and that we also rely on in our brief, in those cases there was very general authorization. So in Oberly, you had very general authorization for states to manage coastal areas. In Tri-M Group, you had very general authorization for states to manage apprenticeship programs. In both cases, the states enacted laws that were protectionist, that discriminated in favor of in-state entities, in-state companies. And this court held, not surprisingly, that that general authorization to manage the coastal area, to manage apprenticeship programs, was not authorization from Congress to discriminate in interstate commerce. Here, the precise language, the express language of the statute, of Section 129A3, authorizes precisely, precisely what plaintiffs claim is the violation. Their claim is that they're paying turnpike tolls that are being used not for the turnpike, for other transportation projects in Pennsylvania. That's the entirety of their claim. That's exactly what Section 129A3 authorizes. The statute specifically says, not that federal funds may be used for X, Y, and Z, but toll revenues. Toll revenues may be used for operation, maintenance, debt service, and to the extent that those are all being addressed, other transportation projects authorized by Title 23. Counsel, let's say that we view that as sufficient authorization. Under the language of the statute, isn't it conditional authorization, conditional on annual certifications, and you've conceded before the district court that those certifications were not made annually? Well, I don't know that we conceded that. I mean, it's possible that the Turnpike Commission who has to make those certifications did so. But assuming that they have not been made annually, the statute is also very clear as to what the remedy for that is. There's no private remedy for that. That condition is enforced by the federal Secretaries of Transportation. Section 129A3C specifically says that the secretary has the authority to essentially require a state to stop collecting tolls if it's not complying. So the secretary, if that was not being complied with, if the Turnpike Commission was not making those annual certifications, the secretary under the statute has the authority to say, then stop collecting the tolls until you start doing so. Well, it's true the secretary may have discretion on how it chooses to handle this. But aren't you sort of trying to have your cake and eat it, too, to say that you have authorization by the public authority to use these fees, and that's directed at the public authority? But the if language that follows for conditional certifications is not qualifying that authorization. It's only qualifying what the secretary is then authorized to do. I think if you look at the structure of the statute of the specific section, 129A3 lays out exactly how toll revenues can be spent, period. I mean, it lays it out separately. It says toll revenues may only be used for, and it lays it out as the court is aware, as I just described, for debt service maintenance operations and then other projects authorized under Title 23. It then separately says if you're not certifying annually that you're complying with that, the secretary may do this. The secretary may order the state to stop collecting tolls until it starts complying. That technical requirement, that requirement that you check off that box and tell and certify to the secretary that you are complying with the statute, does not render an authority suddenly a violation of the Dormant Commerce Clause. What it does is that if you're not complying, if you're either using the money for something not authorized, or as your honor's question implies, if you're not certifying, if you're not meeting the certification requirement, that doesn't suddenly turn that into Dormant Commerce Clause violation, which is what the claim is here. What it does is it's a statutory violation. But you're saying that what Congress has done in 123, sorry, 129A3, is to say we're going to bless this sort of usage of tolls. It will not, and by implication through the Supreme Court precedent, if Congress blesses the conduct, it cannot violate the Commerce Clause. Is that what you're saying? That's precisely. In fact, the principle underlying the Dormant Commerce Clause, and I know the court is aware of this, is that where Congress doesn't speak, where Congress does not regulate interstate commerce, there are still limitations on what states can do. That's the principle underlying. When Congress does speak, when it does regulate interstate commerce, then the Dormant Commerce Clause has no force. It's not dormant. It's been acted upon. Here, Congress has spoken on the precise issues before the court. The ICE TV, the statute itself, addresses exactly what the court has been talking about all morning. The notion, the name itself makes that clear, as does the policy of the statute. It's an intermodal transportation statute. It governs, it encourages, it provides support for many modes of transportation. It specifically mentions the things that we're talking about here, public transit, buses, planes, ports, and so forth. That's the purpose of the statute. So Congress, in this statute, in 1991, began regulating exactly what we're talking about. And then even more specifically, in Section 129, it's regulating toll roads, which is again what we're talking about. Let me go back to what Judge Kraft is asking about, and I am also curious that the lack of certification, which one could argue is a conditioned precedent of being able to use the funds that way, you're saying that doesn't mean the use violated the Dormant Commerce Clause. It is a statutory violation for which there's no private right of access. Exactly, because the Dormant Commerce, once Congress regulates an area, and again, I'm getting to 129, it has regulated the use of toll revenues, which is again, everything this case is about is the use of toll revenues. Plaintiff's objection, they tried sort of looking at the other side of the coin and saying, you know, it's the amount of tolls, but it's the use of the toll revenues for something other than the turnpike. Congress has regulated that. So the Dormant Commerce Clause really has no more force. So if the Turnpike Commission is not complying with Congress's regulations, with Congress's statute that regulates that commerce, that's not a Dormant Commerce Clause issue, it's a statutory violation that can only be enforced by the Secretary of Transportation. So should the analytical frame for a case like this be, if Congress has spoken in an area, go check it out first, and if Congress has spoken, no Dormant Commerce Clause problem. And then if Congress hasn't spoken, then move to tests like Evansville and Pike and complete auto, et cetera, depending on what it falls into. I mean, shouldn't that be the analytical frame? I think there's a very good argument for that. For whatever reason, that's not typically the way the courts have looked at it. Typically courts have first looked at the Dormant Commerce Clause and in many cases said there's no violation here, or done, rather. I think because in many cases, and this is the exception, and you can see this from all of the cases, really the both-party side, including cases like Oberle and Triumph, in many of the congressional authorization cases, the authorization is much more general. All Congress has said is, as I said, states can manage the coastal areas. States can manage apprenticeships. And so it's not clear that Congress is actually regulating the actual interstate commerce that's at issue in those cases, which in all of the cases, the both parties say, we're talking about protectionist state measures, discriminatory measures. Here, you have sort of this confluence where perhaps it would have made more sense to start with the congressional authorization because you have authorization that addresses precisely, almost perfectly, what plaintiffs are alleging is the problem. And second, you don't have any discrimination. So basically, what the state is accused of doing is precisely what Congress has said it can do. So for all but two of the programs, if I understood the briefing correctly, for all but two of the programs, Congress has spoken, no Commerce Clause problem. For the other two programs, if I understand, I'm asking to make sure I understood you correctly, that for the other two programs, those other two programs, the airport and the train, there are multimodal trust fund fees that are collected from other sources and there's no allegation that toll monies were used for these other two programs. And those all, you can't really complain about the use of toll money for those projects. Am I correct? Exactly. And it's just two small amendments to that. But that's precisely right. But one is that for present purposes and for the purposes of the motion to dismiss, we were accepting, because it's not clear enough from the complaint, that those are the only possible two. There's no other ones that are listed in the complaint that possibly are not covered by Title 23. It's possible those are as well if we had more information. But we accept for present purposes that they may not be. So that's number one. And number two is, it's also the fact that the additional sources, the license fees, you know, driver license fees, registration fees, and there's no dispute about this and this is in the record and the trial court relied on it, the total amounts for those far exceed the amounts that the state has spent on those two items. And so, you know, I forget the exact numbers, but for one of them, I think it's like they've collected 70 to 80 million in fees and those programs are funded with, you know, 500,000 or a million dollars. So there's no way to say that the turnpike fees, the turnpike tools that they're objecting to went to those two programs. There's simply no way they could show that. Could a court on a motion to dismiss, on this motion to dismiss, be able to use the congressional authorization avenue just on the pleading or would it need more information to be able to conclude that they were authorizer or if not authorized, not funded by the tolls? Could a judge make that decision on the pleading series? I think they could with the addition, again, and there was no objection to this by plaintiffs and the trial court relied on it and I think based on this court's precedence, with the addition of the budgeting information that we included in our motion to dismiss and I think is consistent with this court's precedence as to what can be considered on a motion to dismiss. So I think that with that addition, I think that that information, the information about the other fees providing the revenue for those two items, that's not in the complaint but we put that information as part of our motion to dismiss. The trial court, the plaintiffs never objected to it or challenged it. The trial court relied on it based on this court's precedence that we cite again and we cite it in our brief here. So do you think one avenue in this case should be to remand, let the district court decide whether or not each of those programs are either funded, I'm sorry, authorized by Congress or through what I gather you're telling me were part of the record because they're publicly available documents and therefore subject to Rule 12b-6 to determine whether they were budgeted in such a way that they didn't use toll money and the district court can make that decision? I think, I'm making the latter argument and I think it would be undisputed. I think the only conclusion can be that there's no way the plaintiffs can show that the toll money that they claim is excessive, is more than what's needed for the turnpike, went to programs that are not covered by Title 24. How could we do that? How could a court without, how could the court do that? If three of us were going to sit in a room and look at the complaint? We would have certain things out, but how would we be able to do the part about the budget? Well, I think it goes without saying, but I will say it anyway, that you don't have to go there for all the reasons I think that Mr. Byer made as to why there's not a dormant commerce clause problem. So you can affirm without even getting to the congressional authorization issue. If you're going to get to the congressional authorization issue, whether because you see that as a different vehicle for affirming the trial court or as an additional basis to affirm the trial court, if you're going to do that, again, I don't think there's been any challenge there. If you look at the pleadings in the trial court, the motion to dismiss, the response, if you look at the trial court's opinion, the trial court cites that information. There's never, not in that court, not in this court, has plaintiffs ever challenged that contention. Their view is, I'm sorry, which contention are you talking about? The contention that anything that they complain about was either authorized by Title 23 or was not, or Turnpike toll money cannot be, I thought their position was none of it was authorized. Well, they can argue, we'll hear them on rebuttal, but I thought he was saying none of it was authorized. They don't believe that the authorization meets this court's or the Supreme Court's precedence for congressional authorization, but they don't dispute that the items that they flag, what they say, that they list of items, and I forget the paragraph, it's a single paragraph with their complaint, where they list items, where they, exactly, where they list those items. They have never contested that those items are within Title 23. Yes, they contest that Congress has not authorized the state to spend the money from the Turnpike tolls on those items, but they have never said that any of those items are not covered by Title 23. They've never gone there because, in their view, Congress hasn't authorized it, but I think it's unquestionable that Congress has authorized it in as specific an express language as it ever could choose. I understand. Thank you. If we go back to H. Hortz's question for a moment about the framework for analysis, it may be the case that this is not the way that courts typically approach it, but as a matter of constitutional avoidance, are we required to address this statutory question first, this authorization question, on the assumption that, even if there were a violation, it's been authorized, before we reach the question of is there, in fact, a constitutional violation? I don't know that you're required to do so. I mean, again, you know, from our perspective, there is no constitutional violation, so starting as the district court did with the Dormant Commerce Clause analysis and concluding that the court does not need to rely on the Constitution to strike down a state statute, there's no constitutional avoidance issue. But I readily acknowledge that if you agree with us, and again, I think the statute is clear, that there is congressional authorization here. That is a simpler way, without getting into the nuances of a constitutional analysis of the Dormant Commerce Clause, that the court can reach the same result that the district court reached that we obviously believe is the correct result, that there is no violation of the Constitution here. That would make it all the more important, given what the district court describes as a confession from the defendants, that there was not annual certifications whether that authorization here is conditional. And if we look at A3, capital A sub 5, here we have the public authority, jurisdictional toll facility, shall ensure that all toll revenues received from operation of the toll facility are used only for, and the first four are unconditional, and five, which is what you are relying on here, starts with this preface. If the public authority certifies annually that the toll facility is being adequately maintained, how is that not conditional authorization at least for the use of these funds for any other purpose for which federal funds may be obligated by a state under this title? And I apologize, Your Honor, because I'm just going to be repeating myself, but I think that even if it's conditional, again, Congress, there is no dormant Commerce Clause problem anymore because Congress is active, and so therefore the Commerce Clause, its Commerce Clause authority is not dormant, so the Commerce Clause doesn't come into play. And I think that you jump down to Section C, and it specifically says, if the Secretary concludes that a public authority has not complied with the limitations on the use. And I think that whether you call it a condition or a limitation, and of course the whole Section 3 is titled Limitations on Use of Revenues, whatever you label it, the mechanism for addressing a failure to comply with the limitations, whether it's the specific one Your Honor is mentioning in Subsection 5, whether it's using it for educational purposes or something else rather than Title 23 purposes, the remedy is in Subsection C. And I think, again, you're already past the point when you realize there's congressional authorization that Congress has exercised its Commerce Clause authority, period. And so there isn't a dormant authority that we need to undertake some type of analysis to say has it been complied with. It has exercised that authority, and so, and it's why to me it's completely logical that Congress would also add in that same section, Subsection C, to provide the remedy if anything in 3A is not complied with, including the one that Your Honor identified, Subsection 5, which obviously is the key one here. I don't need to, I can rest on the briefs on the right to travel issue or if there's no questions. That sounds fine to us. Thank you very much. I won't rest on the briefs on the right to travel issue. I'd like to make a comment or two and then move into the other issues. But there's no question that if you read the Wallach opinion, they found a violation of the constitutional right to travel based on an Evansville analysis. Straight up, plain and simple. The only thing the district court did is say, oh, since Wallach was decided, we have this new Supreme Court case, Saines, S-A-E-N-Z versus Roe, and that has called into doubt all of the law under Evansville which Wallach decided on, and therefore we can't pay attention to what the court did. That approach, as we said in our brief, violates Augustini versus Felton, a very important principle where the Supreme Court informs us that it is not the prerogative of the district court or even of a court of appeals to decide when one of our opinions has been overridden by implication. Here's what the Supreme Court said. We affirm that if a precedent of this court has direct application in a case, Evansville, yet appears to rest on reasons rejected in some other line of decisions, Saines, the court of appeals should follow the case which directly controls Evansville, leaving to this court the prerogative of overruling its own decisions. All right? That's what the Supreme Court has instructed us. In U.S. versus Extreme Associates, this circuit says we steadfastly follow that principle. So the district court here, the Ohio district court, without analysis whom they followed, had no authority to conclude that Saines impliedly overruled Evansville and that the controlling opinion in Wallach on the right to travel is of no value here. We should prevail slam-dunk on the constitutional right to travel and the impairment of that under the standard of Evansville. And we walk through, if you look at our statement of facts and all of the facts there, there's no way that they can satisfy the Evansville standard at 300% of the cost of maintaining the turnpike and the benefits involved. All right? What about the availability of other roadways? Is there, even under Evansville, a constitutional right to use the turnpike as opposed to other roads? Deterrence is not a problem here. What they said is you apply the Evansville test and while you have a right to travel differently and use different routes, you have a constitutional right that is impaired once the Evansville standards rule against you. That's what the Supreme Court said in Evansville. They applied it to the right to travel. All right. And as far as the long-term vitality of the Evansville standard, remember, of course, that it was reaffirmed in Northwest Airlines where the court said the parties have agreed to use Evansville as a standard of fairness. This gets to your question. Just because you satisfy Evans doesn't mean that, or just if you don't satisfy Evans, that it's automatically unconstitutional. If in Northwest Airlines they conclude that Evansville is a standard of fairness and you don't pass Evansville, you are being what we call unfair. That would be a burden, a burden on interstate commerce, which brings us to another issue. If you are using an instrumentality of commerce, you are engaged in interstate commerce. And everyone who travels through the Pennsylvania turnpike is engaged in using a facility of interstate commerce. I don't think that's really where some of Judge Cross's questions were going before, and I shouldn't speak for her, but listening to her, I think the concern was how is it burdened, and we've gone through your position on that. The question was interstate, intrastate, and does it make a difference. The case that calls to mind is the Atlanta civil rights case, House of Atlanta I think it was called, where civil rights charges were being brought against a local lunch counter. And the authority to do that under federal law was that they were engaged in commerce. And they said, look, our customers come in. We're in Atlanta. They have their lunch. We feed them, and they leave. We're not engaged in interstate commerce. And of course the answer was nonsense. You are engaged in interstate commerce. The meat you buy to make a hamburger comes. The beverages you serve. The people who visit you stop, eat, and go on. Everything you do. There's no doubt that those cases would say they had an effect on interstate commerce because of their purchasing authority for things outside of the state. The question here is whether these tolls unduly burden interstate commerce, and that's the question. And the turnpike is an instrumentality of interstate commerce, and it does burden that. Counselor, one question that was raised by some of the last statements that we heard from Mr. Bernstein. Do you agree that you have not disputed that any of the particular expenditures fall within Title 23? We have not disputed that. I've looked at that with some care, and they do fall within that. Which brings us to the congressional authorization question, of course. If you look at 23 U.S. Code 129, which we'll all look at, there are two parts to our congressional authorization and the question you have to ask after looking at the standards in Norfolk Southern and Tri-M Group is could Congress have contemplated what the Pennsylvania legislature was going to do in Act 4489? And recall that ICE-T was first passed in 1991. This other legislation didn't happen. But more to the point, there are two aspects to the problem. The first is could they have contemplated that the tolls would double and triple over 10 years? Was that within the contemplation of Congress? And there is plenty of authority that when Congress enacted this particular provision, they were entitled to assume that tolls would be collected in a constitutionally appropriate manner, collected and imposed in a constitutionally appropriate manner. Not that they would be double, tripled, et cetera. But what is a constitutionally appropriate manner? Not excessive under the Evansville standard. If they're excessive, if they are some multiple of the actual cost of providing the facility or some multiple of the benefits incurred, that is not constitutionally appropriate. But you're asking us to infer what we think Congress could or could not have expected, despite the plain language of the statute. And I think I said this to you earlier, maybe you have it here, but I think it was to you, that Congress was looking to have a substitute pay for various things. It talked about funds that had otherwise been obligated by the feds. The feds aren't just as happy to have the state pay for it. So we could say, in fact, Congress is blessing revenue-raising efforts in whatever way they needed to do it so that the federal government didn't have to pay for those important projects. Your insight into what Congress was contemplating is far more precise than anything I've ever seen. But yours is the same. We're both in the same speculative area, which is you want us to say Congress could not have contemplated the total increase that has occurred. I say that because that's a standard of all the Supreme Court cases mentioned in Norfolk Southern. They must affirmatively contemplate Act 4489. How could they possibly do that in 1991? The state action, doubling and tripling tolls, must be specifically contemplated. What did Congress do? They knew nothing about what was going to happen. It had been a number of years before the tolls were increased at all. That's right. So they couldn't have contemplated it. It was not within the contemplation of Congress. So yes, excess tolls at the end could be used for Title 23 purposes, but that's only one half of the equation. Congress never could have contemplated Act 4489 and the instructions from the Pennsylvania legislature to PTC. Double and triple your tolls, increase them every year, and send us a check for $450 million. Tell me where Congress contemplated that when they passed 23 U.S. Code. They couldn't possibly have done it. The standard for congressional authorization here is extremely high. Just look at it. They can't possibly satisfy that standard. And it's on the toll and position side. And in the nature of things, I try to say it, there are nickels and dimes left over every year that could be used for Title 23 projects. That's the most that they could have been contemplating. But a specific program to double and triple the tolls, collect 300% of the cost of doing business, and then pass it on for other purposes, that was not in any reasonable sense within the contemplation of Congress. They could not have done it. Okay. We thank you for all your arguments, for well-argued, and you all were incredibly well-prepared to answer our questions, even though we put two out. Some of you at the last minute, but we'll comment to you about it as soon as we figure out what our questions were. We would like to get a copy of the transcript, so we'd ask the party to share the expense of that if you don't mind. All right, everybody. Thank you very much. Enjoy the rest of your summer. This has been a program that's not under advisement.